NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In the matter of | : | Case No. 07-18134/JHW |
| Bella Vista Associates, LLC, et al. | : | Adver. No. 07-2241 |
| Debtors | : | |

Rocco and Carol D'Antonio : 

       Plaintiffs    :            **OPINION**

v.

                  :

Bella Visa Associates, LLC, et al.

                  :

       Defendants

                  :

> **FILED**
>
> JAMES J. WALDRON, CLERK
>
> December 18, 2007
>
> U.S. BANKRUPTCY COURT
> CAMDEN, N.J.
> BY: Theresa O'Brien, Judicial
> Assistant to Chief Judge Wizmur

APPEARANCES:    Aris J. Karalis, Esq.
Maureen P. Steady, Esq.
Maschmeyer Karalis P.C.
413 Route 70 East, Suite 300
Cherry Hill, New Jersey  08034
Counsel for the Debtors

Robert J. Lohr, II, Esq.
1246 West Chester Pike, Suite 312
West Chester, PA 19382
Counsel for Rocco and Carol D'Antonio

Robert A. Kargen, Esq.
White and Williams, LLP
1800 One Liberty Place
Philadelphia, PA  19103-7395
Counsel for Citizens Bank of Pennsylvania

Francis J. Lawall, Esq.
Pepper Hamilton, LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103-2799
Counsel for Unsecured Creditors Committee

Kenneth Aaron, Esq.
Weir and Partners
210 Haddon Avenue
Westmont, New Jersey 08108
Counsel for Imaging Associates, Inc.


Rocco and Carol D'Antonio moved on November 5, 2007, for preliminary injunctive relief to enjoin the auction sale, scheduled for November 7, 2007, of property known as the Ridings at Brandywine. Their motion was denied. On November 20, 2007, the quest by the D'Antonios for a stay pending appeal was also denied. On December 14, 2007, an order authorizing the sale of the Ridings at Brandywine free and clear of liens and interests was entered, overruling the objection of the D'Antonios thereto. I write to clarify and expand on these rulings.


## <u>FACTS AND PROCEDURAL HISTORY</u>


On February 25, 2003, Rocco and Carol D'Antonio executed an agreement to sell 117.7 acres of land in West Brandywine Township, Chester County, Pennsylvania to the Lafayette-Hibernia Investment Company. The land subsequently become known as the Ridings at Brandywine. Lafayette assigned its interest to the Elliott Building Group, Ltd. and Ridings at Brandywine Associates, L.P. ("Ridings"). Closing was held on June 24, 2005. According to the D'Antonios, at the closing, for the first time, they were required as a condition of closing to convey to the purchasers an additional parcel of property not included in the original agreement

of sale (hereinafter, the "Inducement Property"), that would be used to establish an access road to the larger property. A separate agreement, entitled the "Notation of Buyer's Inducement to Closing (6/24/05) on Sale of West Brandywine Township, Chester County, PA Premises: The County Parcel 29-4-55.5 and Part of Parcel 29-4-85" (hereinafter, the "Inducement Agreement") was executed, providing that the property in question would be deeded to Ridings, and then redeeded back to the D'Antonios as two separate buildable lots. Redeeding of the property would occur upon the township's approval of the subdivision plan. According to the Agreement, the two lots were to remain "the exclusive property of the Sellers" and they were not intended to become part of the Ridings at Brandywine subdivision. The reconveyance deed for the two new lots, to be designated as Lots 30 and 92, was executed but was not recorded. The deed remains in escrow with the title insurance agent, Robert Chalphin Associates. The reconveyance deed continues to be held in escrow because the condition for release of the escrow, that subdivision approval be obtained for the project, was never achieved.

On the same day as the closing, June 24, 2005, after obtaining the deed to the Inducement Property, the Ridings pledged the Inducement Property as additional collateral for its $16.7 million dollar mortgage loan from Citizens Bank of Pennsylvania. The D'Antonios claim they had no notice of this mortgage. The Ridings also utilized the property as additional collateral for a $5 million dollar secondary mortgage loan from Chesapeake Fifth Avenue Partners, LLC, again allegedly without notice to the D'Antonios. Both mortgages were recorded almost a year later, on June 7, 2006.

On June 10, 2007, nineteen (19) related entities, including Bella Vista Associates, LLC,

The Elliott Building Group, Ltd. and the Ridings at Brandywine Associates, L.P., (hereinafter

"the debtor" or "the debtors") filed separate voluntary petitions under Chapter 11 of the

Bankruptcy Code.  On June 19, 2007, the cases were jointly administered and designated as

Complex Chapter 11 cases.  An Unsecured Creditors' Committee was appointed on June 28,

2007.

Following the filing of the bankruptcy cases, the debtors attempted to obtain financing to

build out each of the real estate projects.  They were unsuccessful, and thereafter adopted a

liquidation strategy.  On August 31, 2007, the debtors moved to sell by auction twelve (12) real

estate development projects, including the Ridings at Brandywine, free and clear of all liens,

claims, interests and encumbrances.  As the sales negotiations progressed, the debtors were able

to reach consensual arrangements with the various mortgagees on the projects to modify the

bidding procedures, to allow for credit bids, and to provide for monetary contribution by the

lenders to the debtors' bankruptcy estate ("carve outs").  An order approving the bidding

procedures was entered on September 20, 2007.

The marketing of the various projects was conducted by the court appointed real estate

consultants to the debtors, KPMG Corporate Finance LLC.  A very aggressive program of due

diligence, advertising, and direct solicitation of offers was pursued by KPMG.  Certif. of Harold

Bordwin (11/19/2007).  Advertising efforts included a direct mail campaign of approximately

7,700 flyers sent to a targeted mailing list, numerous advertisements in national and regional

-4-

newspapers and real estate journals, press releases, property signage and internet marketing. Id. at 2–3. KPMG's marketing efforts produced inquiries from 388 interested parties. At the auction sale on November 7, 2007, thirty three (33) bidders attended. Collectively, the bidders had submitted (57) qualified bids (inclusive of credit bids from the lenders) for the purchase of the projects. The successful bids, most of which were credit bids by the lenders, totaled $41,540,000, with a projected carve out to the bankruptcy estates of $1,667,500. The secured claims against the properties totaled $87,084,000.

In the interim, on October 15, 2007, the D'Antonios commenced an adversary proceeding to remove the Inducement Property from the debtor's bankruptcy estate.[1] The fourteen count complaint alleged fraud against Bradford H. Elliott (president of the Ridings' general partner, EBG Land Corp.), David M. Shafkowitz (vice president of the Elliott Group), Ridings, the Elliott Building Group and EBG Land Corporation. The complaint also alleged breach of fiduciary duty against Mark Chalphin and the title insurance agency. It claimed breach of contract against Ridings and EBG, seeking damages and specific performance. It also sought to quiet title as against the mortgagees, Citizens Bank, Chesapeake Fifth Avenue Partners and the legal owner of the property, Ridings. In the alternative, it sought ejectment.

## DISCUSSION

The D'Antonios have advanced three procedural mechanisms to prevent the sale of the

---

[1]        Adversary number 07-2241.

Inducement Property, including a quest for preliminary injunctive relief, a motion for a stay

pending appeal, and an objection to the form of order authorizing the sale of the property free and

clear of liens and interest, each of which has been denied or overruled.


       A.     <u>Motion for Preliminary Injunction</u>.


On October 31, 2007, the D'Antonios moved for preliminary injunctive relief to enjoin

the sale of the Inducement Property, claiming that they would suffer irreparable harm if the

Inducement Property was permitted to be sold at auction.  The debtor opposed injunctive relief

and asserted that the plaintiffs did not have a reasonable probability of success on the merits

because their failure to record the reconveyance deed rendered their interest null and void under

Pennsylvania law.  Any equitable interest held by the plaintiffs would be avoidable pursuant to

11 U.S.C. § 544(a)(3).  Moreover, the plaintiffs alleged that the harm to the movants would not

be irreparable because they were able to be compensated through an award of monetary damages

if they were successful on the merits of their claim.  In contrast, the debtor would be seriously

harmed if the Inducement Property was not sold as part of the Ridings at Brandywine

development, particularly because it provides access to a significant thoroughfare abutting the

project.


Oral argument was heard in court on November 5, 2007.  At the hearing, the movants

orally cited various authorities to support their claim that they would likely succeed on the

merits, and that they would suffer irreparable harm if the auction were not enjoined.  I denied the

D'Antonios' motion for preliminary injunctive relief, primarily on the ground that the balance of

harm favored the debtor.  Following the hearing, in conjunction with the motion for a stay

pending appeal, the D'Antonios submitted a formal brief to support their quest to enjoin the

auction.  I am now able to review more closely the arguments advanced by the D'Antonios, both

orally and in their formal submission, and to confirm my ruling that their quest for preliminary

injunctive relief must be denied.

Granting preliminary injunctive relief is "an extraordinary remedy" that the courts tend to

grant "only in limited circumstances."  Reedy v. Borough of Collingswood, 204 Fed.Appx. 110,

113-14 (3d Cir. 2006); Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir.

2004); Frank's GMC Truck Ctr., Inc. v. General Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988).

To obtain preliminary injunctive relief, the plaintiff must establish:  (1) that there is a likelihood

that they would succeed on the merits of their cause of action; (2) that they would suffer

irreparable harm if they were denied injunctive relief; (3) that granting them relief would not

impose an even greater harm on the defendants, and (4) that such relief is favored by the public

interest.  Josey v. Beard, 230 Fed.Appx. 240, 241 (3d Cir. 2007); Reedy, 204 Fed.Appx. at 114.

Here, the plaintiffs have failed to meet their burden to establish any of these requirements.

1.    Likelihood of Success.

To establish a likelihood that they would succeed on the merits of their cause of action,

the D'Antonios were required to show that the Inducement Property could not be sold by the

debtor-in-possession free and clear of their equitable interest in the property.  They were

unsuccessful in this regard, because the debtor has established that a bona fide dispute exists

regarding the opportunity of the debtor to avoid the unrecorded deed held in escrow on behalf of

the D'Antonios.  Therefore, the debtor has the opportunity to sell the property free and clear of

the D'Antonios' interest under 11 U.S.C. § 363(f)(4).


Section 363(f) permits the trustee, or Chapter 11 debtor-in-possession, to sell property of

the bankruptcy estate, free and clear of any and all interests in the property, including liens and

interests, if one of five conditions is met.  11 U.S.C. §§ 363(f), 1107(a).  See Precision Industries,

Inc. v. Qualitech Steel SBQ, LLC, 327 F.3d 537, 545 (7th Cir. 2003) ("although section 363(f)

refers to the powers and obligations of the 'trustee,' these are powers and obligations which, in a

Chapter 11 case, inure to the debtor-in-possession").  Pursuant to section 363(f), property may be

sold free and clear if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of
> such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is
> greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a
> money satisfaction of such interest.

11 U.S.C. § 363(f).  Section 363(f) is written in the disjunctive.  Thus, a sale may be approved if

any one of the five conditions listed above exists.  See In re Congoleum Corp., No. 03-51524,

2007 WL 1428477, *1 (Bankr. May 11, 2007); In re NJ Affordable Homes Corp., No. 05-60442,

2006 WL 2128624, *9 (Bankr. D.N.J. June 29, 2006); In re Kellstrom Industries, Inc., 282 B.R.

787, 793 (Bankr. D.Del. 2002).  Here, section 363(f)(4) applies.


Section 363(f)(4) allows a trustee to sell property when the interest asserted in the

property is in bona fide dispute.  The phrase "bona fide dispute" is not defined in the Code.

Courts interpreting § 363(f)(4) generally look to "whether there is an objective basis for either a

factual or legal dispute as to the validity of the asserted interest."  In re NJ Affordable Homes

Corp., No. 05-60442, 2006 WL 2128624, *10 (Bankr. D.N.J. June 29, 2006).  See also In re

Gaylord Grain L.L.C., 306 B.R. 624, 627 (8th Cir. BAP 2004); In re Durango Georgia Paper Co.,

336 B.R. 594, 596 (Bankr. S.D.Ga. 2005); In re Gulf States Steel, Inc. of Ala., 285 B.R. 497, 507

(Bankr. N.D.Ala. 2002); In re Taylor, 198 B.R. 142, 162 (Bankr. D.S.C.1996).  The court does

not have to resolve the dispute prior to the sale; it need only determine that such a dispute exists.

In re Gaylord Grain L.L.C., 306 B.R. at 627.  The goal of section 363(f)(4) is to "allow[] the sale

of property subject to dispute 'so that liquidation of the estate's assets need not be delayed while

such disputes are being litigated.'"  In re Durango Georgia Paper Co., 336 B.R. 594, 597 (Bankr.

S.D.Ga. 2005) (quoting In re Gulf States Steel, Inc., 285 B.R. at 507).  The burden of proof in

this instance rests upon the trustee to establish the existence of a bona fide dispute.  In re

Restaurant Assocs., L.L.C., No. 1:06CV53, 2007 WL 951849, *9 (N.D.W.Va. Mar. 28, 2007); In

re NJ Affordable Homes Corp., 2006 WL 2128624 at *10; In re Gulf States Steel, Inc. of Ala.,

285 B.R. at 507.

Here, the bona fide dispute between the parties concerns the opportunity of the debtor-in-possession, as a hypothetical bona fide purchaser under 11 U.S.C. § 544(a)(3), to defeat the unrecorded deed being held in escrow for the benefit of the D'Antonios.   The D'Antonios are correct that as against the Ridings at Brandywine, LLP, the recording statute does not protect the Ridings from the D'Antonios' assertion of equitable ownership of the Inducement Property.   In re Capital Center Equities, 137 B.R. 60, 609 (Bankr. E.D.Pa. 1992).  However, when the Ridings filed a Chapter 11 case on June 10, 2007, the Ridings became a debtor-in possession, an entity separate and apart from the pre-petition debtor.  Under 11 U.S.C. § 1107, a debtor-in-possession has all of the rights and powers of a Chapter 11 trustee.  Under section 544(a)(3),[2] when real property is at issue, a Chapter 11 trustee or debtor-in-possession acquires the status of a subsequent hypothetical bona fide purchaser, and may avoid an interest in the debtor's property that would otherwise be avoidable by a bona fide purchaser under applicable state law.  The scope of a trustee's avoidance powers "is governed entirely by the substantive law of the state in which the property in question is located as of the bankruptcy petition's filing."  In re Bridge, 18

---

[2]       Section 544(a)(3) provides:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by--
. . .
      (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

11 U.S.C. § 544(a)(3).

F.3d 195, 200 (3d Cir. 1994).  Here, applying section 544(a)(3), the court must determine

whether, under Pennsylvania law, a bona fide purchaser of the debtor's property as of the date of

the petition could defeat the interest of the D'Antonios to take title to the property free and clear

of their interest.


Under Pennsylvania law, an equitable interest in property, e.g., an interest held in the

form of an unrecorded deed, is valid only as against the defendants.  See Land v. Com.,

Pennsylvania Housing Finance Agency, 515 A.2d 1024, 1026 (Pa.Cmwlth. 1986).  It is not

enforceable against a subsequent bona fide purchaser for value, unless that purchaser had actual

or constructive notice of the equitable interest.  Long John Silver's, Inc. v. Fiore, 386 A.2d 569,

572-73 (Pa. Super. 1978).  See also Butler v. Lomas and Nettleton Co., 862 F.2d 1015, 1018 (3d

Cir. 1988) ("In Pennsylvania, a bona fide purchaser is protected if he purchases without notice of

prior interests, including equitable interests."); In re Lauver, 372 B.R. 751, 758 (Bankr. W.D.Pa.

2007); In re Johnston, 333 B.R. 724, 732-33 (Bankr. W.D.Pa. 2005).  "The purpose of this

principle is to discourage secret liens against or secret equities in real property where the holder

of the secret interest or lien may record it to secure its permanent record and place it in a position

from which those who deal with the property thereafter may learn that the owner of the property

does not hold perfect title to the land."  333 B.R. at 732-33.  The Pennsylvania recording statute

provides that:

> All deeds, conveyances, contracts, and other instruments of writing wherein it
> shall be the intention of the parties executing the same to grant, bargain, sell, and
> convey any lands, tenements, or hereditaments situate in this Commonwealth, . . .
> shall be recorded in the office for the recording of deeds in the county where such

lands, tenements, and hereditaments are situate. <u>Every such deed</u>, conveyance,
contract, or other instrument of writing <u>which shall not be acknowledged or
proved and recorded</u>, as aforesaid, <u>shall be adjudged fraudulent and void as to any
subsequent bona fide purchaser</u> or mortgagee or holder of any judgment, duly
entered in the prothonotary's office of the county in which the lands, tenements, or
hereditaments are situate, without actual or constructive notice unless such deed,
conveyance, contract, or instrument of writing shall be recorded, as aforesaid,
before the recording of the deed or conveyance or the entry of the judgment under
which such subsequent purchaser, mortgagee, or judgment creditor shall claim.
Nothing contained in this act shall be construed to repeal or modify any law
providing for the lien of purchase money mortgages.

21 P.S. § 351 (emphasis added).

As noted, under Pennsylvania law, an unrecorded interest is enforceable against a

subsequent bona fide purchaser if that purchaser had actual or constructive knowledge of the

equitable interest. Actual knowledge is not implicated here, because under section 544, the

debtor's actual knowledge is irrelevant. Section 544(a) explicitly states that the trustee, or the

debtor-in-possession, shall have bona fide purchaser status "without regard to any knowledge of

the trustee or of any creditor. " 11 U.S.C. § 544(a).

The crux of the issue is the extent to which, under Pennsylvania law, a bona fide

purchaser of real property under the circumstances presented would have been on constructive

notice of the D'Antonios' equitable interest. The D'Antonios contend that constructive notice is

imputed to the debtor-in-possession because the deed conveying the Inducement Property to

Ridings refers to the subdivision plan proposed for the entire Ridings at Brandywine project.

The subdivision plan, which was not provided to the court, apparently denotes the D'Antonios as

-12-

the owners of the parcel in question.  There is no information in the record about whether the

subdivision plan was filed with the municipality, or was otherwise available.  The only

information is that the plan had not achieved final approval at the time of the Chapter 11 filing,

and was not recorded.  Nevertheless, the D'Antonios maintain that a hypothetical purchaser, in

the exercise of due diligence, would have reviewed the subdivision plan prior to purchasing the

property, and would have discovered the D'Antonios' interest.  In this regard, the D'Antonios

direct our attention to the Third Circuit's decision in McCannon v. Marston, 679 F.2d 13 (3d Cir.

1982).


In McCannon, Miriam McCannon entered into an agreement for the purchase of a

condominium apartment.  She paid her deposit and moved into the property in 1975.  The sale

never went to settlement and the agreement of sale was not recorded.  Four years later, in 1979,

the seller filed for bankruptcy and McCannon sought specific performance.  The trustee sought to

avoid McCannon's interest pursuant to section 544(a)(3).  The Circuit recognized that

McCannon's unrecorded interest was vulnerable to the interests of a subsequent purchaser under

Pennsylvania state law.

> However, in Pennsylvania, clear and open possession of real property generally
> constitutes constructive notice to subsequent purchasers of the rights of the party
> in possession.  Such possession, even in the absence of recording, obliges any
> prospective subsequent purchaser to inquire into the possessor's claimed interests,
> equitable or legal, in that property.  See, e.g., Kinch v. Fluke, 311 Pa. 405, 166 A.
> 905 (1933); Long John Silver's, Inc. v. Fiore, 255 Pa.Super. 183, 386 A.2d 569
> (1978).  Thus in Pennsylvania the rights of a subsequent purchaser do not take
> priority over those of one in clear and open possession of real property.

Id.

-13-

The Third Circuit revisited the issue of constructive notice to a subsequent purchaser in

McLean v. City of Philadelphia, Water Revenue Bureau, 891 F.2d 474 (3d Cir. 1989).  In

McLean, the court limited the import of McCannon, holding that under Pennsylvania law, a bona

fide purchaser could prevail over improperly indexed municipal water and sewer liens.  The court

explained that:

> Although it is true, as the City claims, that the decision in McCannon embraced a
> theory of constructive notice, it did so only as a function of its duty under section
> 544 to apply state law.  See McCannon, 679 F.2d at 15-16.  In that case,
> constructive notice preserved the obligation only because state law said it did:  a
> purchaser of real property is considered in Pennsylvania to be on notice of an
> equitable interest held by a person who is in clear and open possession of that
> property.  Id. In this case, however, state law provides no such argument for the
> City.  Under Pennsylvania law, constructive notice is synonymous with whether
> the lien has been properly indexed: the state's indexing laws, in other words,
> define those circumstances under which a bona fide purchaser may be deemed to
> be on constructive notice of a lien.

891 F.2d at 478.

In two subsequent bankruptcy court decisions, the principle of constructive notice under

Pennsylvania law was construed narrowly.  In Nemacolin, the Chapter 7 trustee sought to sell

certain real property of the debtor.  In re Nemacolin, Inc., 105 B.R. 6 (Bankr. W.D.Pa. 1989).

Eugene Moriarity objected, having purchased several of the undeveloped lots from the debtor

four years earlier.  The lots remained undeveloped and Moriarity had failed to record his deeds.

Moriarity insisted nonetheless that the internal records of the debtor should have placed the

trustee on notice of the sale.  Judge Cosetti disagreed.  He concluded that:

> The language of 11 U.S.C. § 544(a)(3) makes it clear that notice-whether actual or
> constructive-is irrelevant. This statute does not place the burden on the trustee to

-14-

perform the acts a buyer must perform in order to become a bona fide purchaser. Rather, a trustee becomes an automatic bona fide purchaser by the filing of the bankruptcy petition. Recording the deed is the only sure method of protecting an interest in property from a bona fide purchaser-a trustee in bankruptcy. Therefore, the only method Moriarity could have kept the lots from the trustee was by recording a deed. Since Moriarity did not do this, the trustee has the status of a bona fide purchaser. The realty is property of the estate and the trustee and has the right to sell the land at a chapter 7 sale.

Id. at 7. Turning to McCannon, the court reasoned that it:

cannot be read that broadly or it would contradict the plain meaning and intent of the statute. McCannon has unique facts and should be limited to those facts. There, a hotel was being converted into a condominium and a woman was in possession of the property with a land sale or executory contract for the property which is treated under 11 U.S.C. § 365(I). McCannon should not be applied where executory contracts are not implicated. To decide otherwise would contradict both the plain language of sections 544(a)(1) and (3) and the intent of Congress.

Id. at 8.

In In re Capital Center Equities, 137 B.R. 600 (Bankr. E.D.Pa. 1992), to fund the completion of construction on a strip mall, the owner of the mall (the "seller") entered into a Sales/Leaseback Agreement with the purchaser, whereby the seller made periodic repayments of the amounts advanced by the purchaser, the seller was required to repurchase the property, and the deed was unrecorded and held in escrow with the title company. A recorded Memorandum executed by the parties reflected that a Sales/Leaseback Agreement was in place, and that the property was "Conveyed". Id. at 605. The seller filed a Chapter 11 petition and sought to avoid the purchaser's interest through section 544(a)(3). The purchaser alleged constructive notice and

-15-

relied upon McCannon.  The court disagreed that "the recording of the Memorandum satisfied

the dictates of the Pennsylvania recording statutes by giving constructive notice of the

Transaction."  Id. at 610.  Instead, the court reflected that "Pennsylvania law requires more than

the recordation of simply any document which purports to provide notice."  Id.  The court

distinguished McCannon, explaining that:

> The sole basis of the Court of Appeals' decision was its finding that actual or
> constructive notice, via "clear and open possession" of the condominium unit, was
> sufficient to give notice of the owner's interest.  The condominium dweller was
> not required to file, or to record, any document to give constructive or actual
> notice in light of her "clear and open possession" of the unit. . . . McCannon
> stands only for the general premise that a trustee may be precluded from avoiding
> a lien pursuant to § 544(a) where state law holds that constructive notice, of a
> particular type, is sufficient to put a bona fide purchaser on notice.

Id. at 611-12.

Other cases have taken a substantially broader view of constructive notice requirements,

emphasizing the duty of a purchaser to exercise ordinary diligence in the purchasing process, and

to inquire of one who has possession of the property about encumbrances or obstacles to

obtaining clear title.  See, e.g., Mid-State Bank and Trust Co. v. Globalnet Intern., Inc., 735 A.2d

79, 85 (Pa. 1999); Roberts v. Estate of Pursley, 718 A.2d 837, 843 (Pa. Super. 1998).  These

cases hold that if such an inquiry is not made, but would have alerted the purchaser to such

problems, the purchaser is charged with constructive notice of the encumbrance.  Id.  See also

Malamed v. Sedelsky, 30 A.2d 853, 855 (Pa. 1951) (purchaser must inquire of parties in actual

possession); Sidle v. Kaufman, 29 A.2d 77, 82 (Pa. 1942) (purchaser failed to inquire further

despite knowing someone else had been in actual possession of the property); Volunteer Fire Co.

-16-

of New Buffalo v. Hilltop Oil Co., 602 A.2d 1348, 1353-54 (Pa. Super. 1992) (a gap in the title

required the purchaser to inquire further); Long John Silver's, Inc. v. Fiore, 386 A.2d 569, 573

(Pa. Super. 1978) (purchaser had actual knowledge of a prior interest and should have inquired

further).

Still other Pennsylvania courts have recognized an exception to the duty of a purchaser to

inquire where the party in possession is also the record owner.  See McCannon v. Marston, 679

F.2d at 17 ("The only Pennsylvania cases cited . . . find no obligation to inquire in circumstances

where the grantor was both record owner and in possession and where the one in possession was

sharing possession with the record owner."); In re Lauver, 372 B.R. 751, 762 (Bankr. W.D.Pa.

2007) ("Such duty of inquiry normally does not arise when the person in possession of the

property also is the title owner thereof."); Incorporated Trustees of Salvation Army in

Pennsylvania v. Lawson, 143 A. 113, 114 (Pa. 1928).  See also Schell v. Kneedler, 59 A.2d 91,

92 (Pa. 1948); Stewart v. Freeman, 22 Pa. 120 (Pa. 1853) (verifying possession and record

ownership, the purchase "is required to look no further"); Lefever v. Armstrong, 15 Pa. Super.

565 (1900).  Here, the land was comprised of unimproved lots, but the debtor held both

possession and record ownership.

This discussion highlights the various approaches taken by courts applying constructive

notice principles under Pennsylvania law.   What is clear for our purposes is that there is a bona

fide dispute between the bankruptcy estate and the D'Antonios about whether the estate can

avoid the D'Antonios' unrecorded deed.  The dispute does not have to be resolved before the

estate may be authorized to sell the property free and clear under section 363(f)(4).  The movants

have failed to establish a basis to defeat the estate's opportunity in this regard.


        The D'Antonios offer an alternative argument to advance their position that they have a

likelihood of success in permanently enjoining the sale of the Inducement Property.  The

D'Antonios contend that the Inducement Property is not property of the debtor's estate on two

grounds.  First, they point to the debtor's schedules and Statement of Financial Affairs ("SFA")

as evidence that the debtor acknowledged the D'Antonios' superior interest and protected

equitable ownership.  In Schedule A, the debtor describes the West Brandywine property as

consisting of 90 lots, rather than the 92 lots encompassed by the proposed subdivision plan,

which would include the Inducement Property.  The debtor lists two mortgages and two statutory

liens asserted against this property, but does not mention the interest held by the D'Antonios.  In

fact, the D'Antonios are not listed as either secured or unsecured creditors.  Instead, in response

to Question #14 in the SFA, the debtor reflects that it "is responsible to redeed" to the

D'Antonios' Lots 30 and 92, and that the deeds are being held in escrow pending the approval

and recordation of the subdivision plan.  The D'Antonios contend that these acknowledgments

by the debtor establish that the Inducement Property is not property of the estate under section

541(a)(1).


        While the D'Antonios correctly reflect the information contained in the debtor's

Schedules and SFA, those statements do not preclude the debtor-in-possession from availing

itself of the avoidance opportunities under the Bankruptcy Code.  The information simply reflects

the factual matrix that existed between the parties before the filing.  The information does not

dictate the legal consequences of the filing.

Lastly, the D'Antonios contend that under section 541(a)(3),[3] the bankruptcy estate does

not include any interest in property that may be recovered by the trustee (or debtor-in-possession)

under its avoidance powers during the case until the property is actually recovered.  See, e.g., In

re Wagner, 353 B.R. 106, 112-13 (Bankr. W.D.Pa. 2006).  Therefore, even if the debtor can

avoid the D'Antonios' interest in the Inducement Property, because it has not yet been avoided, it

is not property of the estate and cannot be sold.  This argument must also be rejected.  The estate

holds legal title to the property.  Under section 363(f)(4), the trustee can sell the property.

I conclude that the movants failed to establish a likelihood of success for preliminary

injunctive relief.

---

[3]      Section 541(a)(3) provides:

(a) The commencement of a case under section 301, 302, or 303 of this title
creates an estate. Such estate is comprised of all the following property, wherever
located and by whomever held:
. . .
       (3) Any interest in property that the trustee recovers under section 329(b),
363(n), 543, 550, 553, or 723 of this title.

11 U.S.C. § 541(a)(3).

2.      Irreparable Harm.

The irreparable harm requirement is met "if a plaintiff demonstrates a significant risk that

he or she will experience harm that cannot adequately be compensated after the fact by monetary

damages.  This is not an easy burden."  Adams v. Freedom Forge Corp., 204 F.3d 475, 484-85

(3d Cir. 2000) (citing to Frank's GMC Truck Center, 847 F.2d at 102-03).  See also Reedy, 204

Fed.Appx. at 114.  It is generally recognized that "monetary relief fails to provide adequate

compensation for an interest in real property, which by its very nature is considered unique."

O'Hagan v. U.S., 86 F.3d 776, 783 (8th Cir. 1996); Narragansett Indian Tribe v. Guilbert, 934

F.2d 4, 6-7 (1st Cir. 1991); Pelfresne v. Village of Williams Bay, 865 F.2d 877, 883 (7th Cir.

1989) ("As a general rule, interference with the enjoyment or possession of land is considered

'irreparable' since land is viewed as a unique commodity for which monetary compensation is an

inadequate substitute.").  That is not a per se rule, but rather suggests a presumption of

irreparable harm.  See, e.g., KP First Ave., L.P. v. Prentiss Properties Acquisition Partners, L.P.,

No. CIV. A. 01-1396, 2001 WL 438416, *4 (E.D.Pa. 2001) ("These cases perhaps suggest a

presumption, but do not establish the per se rule of irreparable harm.").

Here, the movants have failed to show irreparable harm.  The D'Antonios seek money

judgments from several other defendants for their loss.  As well, the performance of the

Inducement Agreement between the parties is no longer possible.  The Inducement Agreement

contemplated that when the Inducement Property would be reconveyed to the D'Antonios, the

lots would be buildable lots located in a development that had final subdivision approval.  The

purchaser agreed that if the D'Antonios were unable to obtain building permits to build upon the

lots, the purchaser would provide "all needed engineering, surveying, planning, legal or other

technical services, as may be required to obtain the same".  The purchaser also agreed to donate

and license to the purchaser "the use of full architectural plans identical to plans for homes

within the Ridings at Brandywine Subdivision."  Now, there is no township subdivision

approval, and no prospect that the purchaser, now a liquidating debtor-in-possession, will fulfill

its contractual obligations.  The prospective purchaser at the auction sale of the property is not

bound by the Inducement Agreement.  The movants have failed to meet their burden to show

irreparable harm.


    3.  <u>Balance of Harm</u>.


   The third element, requiring a balancing of the relative harm to each party, favors denying

injunctive relief to the D'Antonios.  It is certainly recognized that the D'Antonios intended to

retain the Inducement Property when they sold the Ridings parcel to the debtor in 2005.  The

parties agreed that the deed to the Inducement Property would be reconveyed to the D'Antonios

as soon as final subdivision approval was obtained from the township.  It appears from the

Inducement Agreement that the D'Antonios anticipated receiving two buildable lots, on which

they could build two homes like the homes contemplated for the remainder of the project.  The

record does not reflect the value of the Inducement Property.  The D'Antonios have sought

damages against several of the defendants in the amount of $75,000, as to each defendant,

suggesting that they believe the value of the unimproved Inducement Property approximates that

amount.[4]  It does not appear from the record that the D'Antonios are in possession of the

Inducement Property.  If the sale of the property free and clear of the interest of the D'Antonios is

accomplished, there is no doubt that the D'Antonios will be harmed, with the prospect that their

interest could be eliminated by the sale.  However, it must be noted that the D'Antonios' interest

was placed into jeopardy at the moment of the bankruptcy filing.   As of that time, the debtor-in-

possession had the opportunity to avoid the D'Antonios' interest.  The sale simply liquidates the

asset.  Any entitlement by the D'Antonios attaches to the proceeds of the sale, pending further

order of the court.


As to the harm to the debtors if preliminary injunctive relief were afforded to the

D'Antonios, it must be recalled that such relief was first requested by the D'Antonios in writing

on October 31, 2007, and was listed for hearing on November 5, 2007, two days prior to the

auction sale of most of the affiliated debtors' projects.[5]  By that time, as noted above, extensive

marketing efforts had been advanced on behalf of all of the debtors, and the various projects were

poised to proceed with a substantial auction that generated nationwide interest.  It appeared that

the requested injunction regarding the sale of the Inducement Property might have substantially

impeded the sale of the Ridings project.  A site plan was presented in court at the preliminary

---

[4]     No proofs have been submitted regarding the value of the Inducement Property.  I
make no findings in that regard, but merely highlight the amount of damages sought by the
D'Antonios against each defendant in their complaint.

[5]     The D'Antonios filed an objection to the auction bidding procedures, the auction
sale, and the quest by the debtors to sell property free and clear of liens and interest on September
10, 2007.  The objections of the D'Antonios were preserved pending the results of the auction
sales.

injunction hearing, which showed that the Inducement Property contained a proposed access road

to a thoroughfare that would benefit the remainder of the project.  At that point, it was unclear

whether the site plan contemplated by the debtor would be adopted by a prospective purchaser at

the auction.  Nevertheless, the issue of access to the remainder of the project through the

Inducement Property raised a serious question about the potential negative impact of removing

the Inducement Property from the auction sale of the Ridings at Brandywine project.

Based on these considerations, I determined at the November 5, 2007 hearing that the

balance of harm favored the debtor.

4.      Public Interest.

The public interest also favors the debtor, and is implicated here in the context of

upholding the integrity and enforcement of the Pennsylvania recording statute, vis-a-vis a bona

fide purchaser for value.  The recording statute ensures certainty in matters of land ownership,

and discourages secret interests and liens from being enforced against subsequent bona fide

purchasers.  In re Johnson, 333 B.R. 724, 733 (Bankr. W.D.Pa. 2005).  The recording statute "is

designed to eliminate disputes such as this by encouraging recording and perfection.  Recording

and perfection also reduce fraud and the disputes related to fraud." In re Nemacolin, Inc., 105

B.R. at 8.

Applying these four factors, I determined to deny the plaintiff's request for preliminary

-23-

injunctive relief.

       B.      <u>Stay Pending Appeal</u>.

On November 12, 2007, the plaintiffs filed a notice of appeal of the decision denying them preliminary injunctive relief.  One week later, on November 19, 2007, the plaintiffs filed a motion seeking to stay the approval of the sale of the Ridings property, pending the resolution of their appeal.  On the plaintiffs' quest for shortened time of the return date, I listed the matter for the following day, November 20, 2007.

On November 20, 2007, the auction sales results were presented to the court for approval. The sale of five of the developments was approved without objection.  The sale of several additional developments was adjourned until December 5, 2007, to resolve other objections.  The sale of the Ridings at Brandywine property at $2.5 million dollars was disputed.  The top two bidders disputed who was actually the highest and best bidder.  The bidding was reopened and the new winning bid was presented by Imaging Associates at $2.95 million.  The backup bid is held by Longview in the amount of $2.8 million.

At the hearing, the D'Antonios' request for a stay pending appeal was considered and denied.  An order was entered on December 5, 2007 confirming the denial of the stay pending appeal.

A stay pending appeal is available under Fed.R.Bankr.P. 7062[6] and 8005[7].  See In re

Trans World Airlines, Inc., 18 F.3d 208, 212 (3d Cir. 1994).  The standard for a stay pending

appeal is the same as that for preliminary injunctive relief.  See O Centro Espirita Beneficiente

Uniao De Vegetal v. Ashcroft, 314 F.3d 463, 465-66 (10th Cir. 2002); Republic of Philippines v.

Westinghouse Elec. Corp., 949 F.2d 653, 658 (3d Cir. 1991); In re Smithers, No. 03-65561, 2005

WL 4030095, *1 (Bankr. S.D.Ohio July 13, 2005) ("In passing on a request for a stay pending

appeal, a court must apply substantially the same factors that govern requests for temporary or

preliminary injunctive relief.").


As with the quest by the D'Antonios to obtain preliminary injunctive relief to enjoin the

sale, I concluded that the D'Antonios failed to meet their burden to establish the four factors

necessary to obtain a stay pending appeal.  The considerations for denying a stay pending appeal

were identical to the considerations in denying the movants' quest for preliminary injunctive

---

[6]       Rule 62 applies in adversary proceedings pursuant to Fed.R.Bankr.P. 7062.  Rule
62(c) provides that "[w]hile an appeal is pending from an interlocutory order or final judgment
that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an
injunction on terms for bond or other terms that secure the opposing party's rights."

[7]       Rule 8005 provides in relevant part:

A motion for a stay of the judgment, order, or decree of a bankruptcy judge, for
approval of a supersedeas bond, or for other relief pending appeal must ordinarily
be presented to the bankruptcy judge in the first instance. Notwithstanding Rule
7062 but subject to the power of the district court and the bankruptcy appellate
panel reserved hereinafter, the bankruptcy judge may suspend or order the
continuation of other proceedings in the case under the Code or make any other
appropriate order during the pendency of an appeal on such terms as will protect
the rights of all parties in interest.

Fed.R.Bankr.P. 8005.

relief, with a change only in the factual circumstances governing the analysis of the balance of

harm between the parties.  As noted, on November 20, 2007, the results of the auction sales were

presented to the court.  The successful bidder for The Ridings, Imaging Associates, bid $2.9

million for the project, inclusive of the property claimed by the D'Antonios.  The mortgagees,[8]

who are collectively owed over $8 million on the project, agreed to the sale, and agreed to

contribute $120,000 to the bankruptcy estate if the sale was approved free and clear of liens.  If

the relief sought by the D'Antonios was granted, or if the matter was stayed pending appeal, it is

likely that both the successful bidder and the alternate bidder would seek to withdraw as

prospective purchasers.  The harm to the debtor would be either  that the property would be lost

to foreclosure if the mortgagees' liens were validated, or that the debtor would have to locate

another purchaser to sell the property, if the liens were avoided.  In the latter circumstance, the

debtor would incur the costs to maintain the property until it could be liquidated.  The harm to

the debtor is greater than the harm to the D'Antonios here.


Even after the auction sale results are known, the result is the same.  The injunctive relief

sought by the D'Antonios must be denied.


C.    Order Approving Sale Free and Clear of Liens and Interests.


On December 10, 2007, the debtor and the prospective purchaser of the Ridings, Imaging

---

[8]    The secured positions of both the first and second mortgagees are being challenged by the debtor on the ground of faulty acknowledgments in separate adversary proceedings.

Associates, presented to the court a proposed form of order approving the sale of the Ridings free

and clear of liens and interests.   To insure that the D'Antonios had an opportunity to be heard

before the order was entered, a telephone conference call was scheduled for Friday, December

14, 2007.   During the conference call, the objection of the D'Antonios to the entry of the order

was overruled, and the order was entered.   Of particular note in the order was the authorization to

transfer the property to the successful bidder, Imaging Associates,

> free and clear of . . . any mortgages, security interests, conditional sale or other
> title retention agreements, unrecorded deeds or transfers of title, pledges, liens,
> claims, judgments, demands, interests, easements, licenses, charges,
> encumbrances, defects, encroachments, leases, tenancies, options, rights of first
> refusal, and restrictions of all kinds (collectively, the "Liens and Claims").

Order at 7, ¶ 3 (12/14/07).   As well, the order contains injunctive relief in favor of Imaging

Associates enjoining all persons and entities who assert an interest in the property from asserting

those interests or claims as follows:

> Pursuant to sections 105(a) and 363 of the Bankruptcy Code and except as
> expressly permitted or otherwise specifically provided by this Order, all persons
> and entities, including, but not limited to, all debt security holders, equity security
> holders, governmental, tax, and regulatory authorities, lenders, trade and other
> creditors, holding interests of any kind or nature whatsoever against or in the
> Ridings Debtor or the Mortgaged Premises (whether legal or equitable, secured or
> unsecured, matured or unmatured, contingent or non-contingent, senior or
> subordinated), arising under or out of, in connection with, or in any way relating
> to, the Ridings Debtor, the Mortgaged Premises, the operation of the Ridings
> Debtor's business prior to the closing, or the transfer of the Mortgaged Premises,
> are hereby forever barred, estopped, and permanently enjoined from asserting
> against the Successful Bidder, its successors or assigns and the Mortgaged
> Premises, such persons' or entities' interests or claim.

Id. at 9, ¶ 10.   Both of these provisions are authorized and substantiated under 11 U.S.C. § 363

(b) and (f).

The Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986).  The factors considered by bankruptcy courts to determine whether such sales may be approved include:  (1) whether there is a sound business reason for the sale; (2) whether the sale is proposed in good faith; (3) whether adequate and reasonable notice has been afforded, and (4) whether a fair and reasonable purchase price is offered.  See In re Congoleum Corp., No. 03-51524, 2007 WL 1428477, *2 (Bankr. May 11, 2007).

All of these factors favor approval of the sale of the Ridings project here.  First, the debtor has a sound business reason for the sale.  The debtor has provided certifications from its principal demonstrating that serious efforts were exerted by the debtor after filing to obtain financing to build out the project.  Those efforts were unsuccessful.  The only remaining alternative was to liquidate the project, along with the projects of this debtor's affiliates, in a coordinated and deliberate fashion, with the consent of the various lenders.  The sale of the project avoided the accrual of continuing expenses which the bankruptcy estate could not afford to pay, and achieved "carve out" moneys paid by the lenders on account of any obligation that they may have incurred under 11 U.S.C. § 506(c) (opportunity of trustee to recover costs and expenses incurred in disposing of property).  Second, I can readily conclude that the sale was proposed in good faith.  No suggestion of lack of good faith is presented here.  Third, the

aggressive and extensive marketing efforts documented by the court appointed real estate

consultant constitute adequate and reasonable notice.  Last, it has been held that a public auction

that is widely advertised "may be sufficient to establish that one has paid 'value' for the assets of

a bankrupt."  <u>Abbotts Dairies</u>, 788 F.2d at 149.

As noted above, the debtor has also substantiated its quest to sell the property free and

clear of liens and interests pursuant to section 363(f)(4).

Orders have previously been entered confirming these rulings.

Dated:   December 18, 2007

_____
JUDITH H. WIZMUR
CHIEF JUDGE
U.S. BANKRUPTCY COURT